# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**MARY K. GILBERT,**

       **Plaintiff,**

**-vs-**                         **Case No.  6:03-cv-1193-Orl-28JGG**

**WALT DISNEY PARKS AND RESORTS, LLC,**

       **Defendant.**

_____/

## ORDER

Mary K. Gilbert ("Ms. Gilbert") brings the instant action against her former employer, Walt Disney Parks and Resorts, LLC ("WDPR") alleging gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and the Florida Civil Rights Act of 1992 ("FCRA"), §§ 760.01-.11, 509.092, Florida Statutes.  Ms. Gilbert claims that she was terminated based on her gender and in retaliation for complaining about being treated less favorably than similarly-situated male employees.  WDPR maintains, however, that Ms. Gilbert was not treated any differently than comparable males and that she was terminated for poor performance rather than for a discriminatory or retaliatory reason.

This case is currently before the Court on WDPR's Motion for Summary Final Judgment (Doc. 34), in response to which Ms. Gilbert has filed a Memorandum in Opposition (Doc. 41).  Having considered the parties' arguments, the record, and pertinent law, and as more specifically set forth below, the Court grants WDPR's motion for summary judgment

as to all of Ms. Gilbert's claims.

## I.  Factual Background[1]

Ms. Gilbert was employed by WDPR from May 1998 until she was terminated in May 2002.  Ms. Gilbert was hired as Vice President – Travel Operations and Product Development, an executive-level position.  Ms. Gilbert had responsibility for the Disney Reservation Center ("DRC"), which handles reservations and ticket sales for hotels, restaurants, and theme parks at the Walt Disney World Resort here in central Florida.  Throughout her employment, Ms. Gilbert reported to Randy Garfield, the Executive Vice President of Sales and Travel Operations for WDPR and the President of the Walt Disney Travel Company.  Mr. Garfield explains in an affidavit that he sought a leader with strong "people skills" and he hired Ms. Gilbert because she possessed such skills.  (Aff. of Randy Garfield, Def.'s Ex. 3 at 2).

In her performance evaluations, which were completed at the end of each fiscal year Ms. Gilbert received good performance reviews, including for fiscal 2001 – which ended in October 2001 –  when she received a "C" – the highest possible rating.  (See Performance Reviews, Exs. 13, 15, & 17 to Gilbert Dep., Def.'s Ex. 1).  Mr. Garfield's comments on her 2001 year-end review, which he signed on November 14, 2001, included the following: "Mary Kay has multiple priorities and numerous internal interfaces.  She is a very good business partner and is well liked.  In order to ensure adequate, balanced focus on existing

---

[1]The facts in this background section are taken largely from the Statement of Undisputed Facts in WDPR's motion (Doc. 34), in conjunction with Ms. Gilbert's responsive Statement of Facts in her opposition memorandum (Doc. 41).

tactical priorities, strategic initiatives and cast/guest satisfaction I would encourage Mary Kay to further enhance the involvement and exposure of her 2 key executives" (Gilbert's 2001 Performance Review, Ex. 17 to Gilbert Dep., at "0490"); "capable leader who has strong skills and adds value however she needs to further enhance her ability to communicate concisely and persuasively" (Id. at "0491"); "Mary Kay has done an outstanding job of changing the culture at DRC and effecting very positive improvements resulting in much better guest service, reduced attrition and the capability to be highly adaptive.  She has been instrumental in implementing CRM [Customer Relationship Management] at DRC and in being an active participant in Destination Disney.  While the team overdelivered against the majority of goals, they did fall short of some as a result of market dynamics and changing priorities.  I would encourage Mary Kay to continue to enhance the visibility of her key leaders and try to find ways to have DRC become a talent incubator.  From a quantitative, objective point of view which does not factor in external influences her performance would be ranked an E however given the degree of difficulty this year I would re-evaluate this as a 'C.'"(Id. at 0493).

During the summer of 2001, DRC began initial rollout of "Customer Relationship Management" ("CRM"), which involved collection of data from actual and prospective guests. CRM was an early phase of "Destination Disney," which the parties describe as "a multi-year, company-wide initiative intended to enhance guest experience, marketing, and other areas of the company."  (Doc. 34 at 2 ¶ 3; Doc. 41 at 1 ¶ 3).  The parties further agree that "[i]mplementation of CRM required change at all levels of DRC and was a top priority." (Id.).

After the September 11, 2001, terrorist attacks, a 15% reduction in call volume was

anticipated at DRC.  However, call volume did not decrease by 15% as expected but instead increased by 30% after September 11th.   Additionally, DRC experienced significant absenteeism and attrition among the call center employees during this time frame. As a result, by February 2002, DRC was unable to handle its call volume.   Furthermore, reservationists were not utilizing the CRM technology as much as expected.

According to several WDPR employees, in early 2002 concern arose regarding the problems faced by DRC and Gilbert's leadership ability to lead DRC through the difficulties it was experiencing and changes it was undergoing due to the implementation of CRM.  For example, Douglas McGuire, the Vice President of Marketing, Sales, Finance, and Planning – who also reported to Garfield – states in an affidavit that Terry Michielssen and Terri Brister, two executives who reported directly to Ms. Gilbert, had separately informed him that they were concerned about Ms. Gilbert's ability to prioritize and to manage DRC.  (Aff. of Douglas McGuire, Def.'s Ex. 6 at 2-3).  McGuire "also had become personally aware that Gilbert was displaying a lot of defensiveness and did not seem to want to consult anyone for assistance." (Id. at 3).  McGuire became concerned enough to contact Mr. Garfield while Garfield was out of town to inform him of his concerns, and McGuire also e-mailed Garfield on this topic. (Id.).  In other affidavits, Ms. Gilbert's direct reports, Ms. Michielssen and Ms. Brister, explain the concerns they had about Ms. Gilbert's leadership abilities.  (Affs. of Teresa Marie Dola[2] and Tamara Brister, Def.'s Exs. 4 & 5).

In a series of meetings in early 2002, the issues that DRC faced were discussed.  Ms.

_____

[2]Ms. Michielssen is now known as Ms. Dola.  (See Dola Aff., Def.'s Ex. 4 at 1).

-4-

Gilbert claims that during some of these meetings Mr. Garfield humiliated her and treated her differently than her male peers.  At a February 26, 2002 meeting, after Ms. Gilbert spoke about the utilization of CRM by reservation agents Mr. Garfield allegedly asked Ms. Gilbert very loudly, "What is your point?," interrupted her when she tried to respond, and ignored her for the remainder of the presentation.  (See Gilbert's Written Complaint of Discrimination to Human Relations Department, Ex. 30 to Gilbert Dep., at 1-2).  Ms. Gilbert states that she "left the meeting shaking and concerned for [her] job and career." (Id. at 2).  Ms. Gilbert told Mr. Garfield after the meeting that she felt disrespected by his comment and behavior, and Mr. Garfield apologized.  (Id.).

Ms. Gilbert asserts that at another meeting two days later, on February 28, 2002, Mr. Garfield "came in[to] the meeting very angry at" her, and "then proceeded to fire off several questions about facilities which [she] attempted to answer even though he didn't let [her] speak."  (Id.).  As later described by Ms. Gilbert:  "After the meeting I asked Randy for feedback about the capital authorization process.  He indicated I should seek help for those types of projects.  I then asked Randy to display more respect for me in meetings with other people.  He did not respond.  I left that meeting with clear understanding that Randy did not care how he treated me." (Id.).  In her deposition, Ms. Gilbert testified that after the February 26 and 28, 2002 meetings she "felt that [she] was definitely being treated different than [her] peers" and she "thought it was [because of] either [her] gender or [her] personality." (Gilbert Dep., Def.'s Ex. 1 at 210 ll. 15-24).

In February 2002, Mr. Garfield established a cross-functional team called the DRC Steering Committee, which consisted of senior-level employees from several departments,

including Marketing, Human Resources, Destination Disney, Finance, and Organizational Development.  (Garfield Aff. at 17).  Mr. Garfield states that this committee was established to assist Ms. Gilbert; Ms. Gilbert acknowledges the existence of the committee but denies that its purpose was to assist her.  (Doc. 34 at 3-4 ¶ 7; Doc. 41 at 5-6 ¶ 7).

Mr. Garfield and Kelly Frank, a Vice President in the Human Resources Department who served on the DRC Steering Committee, gave feedback to Ms. Gilbert regarding the challenges facing DRC.  Additionally, Mr. Garfield gave Ms. Gilbert informal feedback from time to time, and on March 14, 2002, he held a formal counseling session with Ms. Gilbert during which he used notes.  Ms. Gilbert characterized the feedback she received from Mr. Garfield at that session as "good feedback," and she requested a written copy but, on the advice of Ms. Frank, Mr. Garfield did not provide Ms. Gilbert with any written feedback on that date.  (Doc. 34 at 8 ¶ 11).  The written notes from that feedback session reflect that Mr. Garfield told Ms. Gilbert that he was troubled by her leadership style and that during the six months prior to March 2002, "when confronted by non routine operations which stressed [her] staffing and guest service models [she] had difficulty in stepping back and taking a measured, holistic view of [her] resources and the issues."  (Ex. 5 to Garfield Aff.).  Further, Garfield identified, inter alia, issues with "lack of prioritization," "micromanagement," "victim mentality/overly defensive/blaming others," "creating swirl for the team," and a need to "[n]urture diverse points of view and capitalize on the talents of [her] leaders."  (Id.).

At a meeting on March 20, 2002, Ms. Gilbert "felt attacked, disrespected and put down by Randy."  (Ex. 30 to Gilbert Dep., at 3).  Ms. Gilbert states that Mr. Garfield "looked at her angrily" when he entered the room and asked her about some positions that were

being "re-leveled" and told her that he would "be anxious to hear what took so long for them to get to" him.  (Id.).  Mr. Garfield then made comments throughout the meetings about the problems at DRC and how it could be better led.  (Id.).  Ms. Gilbert later told Mr. Garfield that his comments during that meeting made her feel disrespected, and she asked him to give her feedback in private instead.  (Id.).  Mr. Garfield responded by telling her that she was "too sensitive" and "need[ed] to just take it because [she was] a Vice President."  (Id.).  Ms. Gilbert "realized then that he would continue to treat me in an unacceptable fashion because [she] was a female."  (Id.).  At another meeting two days later, Mr. Garfield was "disrespectful of [Ms. Gilbert's] comments and minimized the contribution [she] had made to support [their] business."  (Id.).  Ms. Gilbert "left the meeting feeling very unsupported and embarrassed."  (Id. at 3).

In early April 2002, Mr. Garfield and Ms. Frank began discussing the possibility of terminating Ms. Gilbert.  (Doc. 34 at 7 ¶ 18; Doc. 41 at 10 ¶ 18).  Mr. Garfield states in his affidavit that during his weekly meeting with Al Weiss, the President of Walt Disney World Resort, on April 4, 2002, Mr. Garfield brought the issue of Ms. Gilbert's performance to Mr. Weiss's attention.  (Garfield Aff. at 14 ¶ 33).  Mr. Garfield's notes from that meeting with Mr. Weiss refer to Ms. Gilbert as follows:  "Good fit re: people skills and requirements for role through mid 2001 but not the right fit to go forward regarding strategy, focus, prioritization, etc.  What we interpreted as communication issues is actually courage related and a competitive perspective to take credit and not develop senior staff.  We are working on potential solutions including potential role swap, termination or severance package."  (Ex. 10 to Garfield Aff.).

Mr. Garfield further states in his affidavit that by April 11, 2002, after additional discussion with Ms. Frank and Meg Crofton of Human Resources, he had determined that termination of Ms. Gilbert was the only option because of Ms. Gilbert's inability to lead DRC and other issues that had come to his attention that had caused him to lose his trust in Ms. Gilbert.  (Garfield Aff. at 14 ¶ 36).  Mr. Garfield hoped to replace Ms. Gilbert with George Kalogridis, a longtime Disney employee who at that time was a Vice President at Downtown Disney.  (Id. at 15 ¶ 39).  Mr. Garfield briefed Mr. Weiss on this issue at his weekly meeting on April 11; Mr. Garfield's notes for that meeting state in part regarding DRC:  "Morale high but clearly we have to make a leadership change.  Discussed George K with both Lee and Karl Holz who are supportive but do not want to take MKG even as a GM.  With your approval I'd like to speak with George after consulting Meg, Kelly, Lee and Karl for the optimum communication points and approach.  Options for MKG now are either a performance development plan (which we do not recommend), severance package or Spcl Projects status with severance of 6 months."  (Ex. 12 to Garfield Aff.).

Mr. Garfield states in his affidavit that after speaking with Kalogridis's supervisors and getting approval to speak to Kalogridis, he spoke to Kalogridis on April 18, 2002, and Kalogridis indicated that he was interested in the position.  (Garfield Aff. at 15-16 ¶ 39). Kalogridis's supervisor, Lee Cockerell, confirms in an affidavit that Mr. Garfield approached him in early April 2002 about his desire to hire Kalogridis to replace Ms. Gilbert.  (Aff. of Lee Cockerell, Def.'s Ex. 9 at 2 ¶ 4).  Mr. Garfield and Ms. Frank were not sure exactly when the leadership change would be made, but a transition period of several weeks was anticipated. (Garfield Aff. at 16 ¶ 39; Aff. of Kelly Frank, Def.'s Ex. 7 at 5 ¶ 13).

Also on April 18 – the same day that Mr. Garfield spoke to Mr. Kalogridis – the fifth meeting about which Ms. Gilbert complains took place.  Ms. Gilbert describes that meeting as "by far, the most humiliating."  (Ex. 30 to Gilbert Dep., at 3).  One of the attendees told Mr. Garfield that there was an issue reading production of a particular report that was needed to track sales for CRM.  Mr. Garfield responded that "he had just heard about the problem from [Ms. Gilbert] in a voice mail," and he then turn[ed] to Ms. Gilbert and asked "very angrily, 'Why did it take 7 months to figure that out?'"  (Id.).  Ms. Gilbert responded that "we assumed the reports were not being produced due to problems with the implementation of the SMART system."  (Id.).  Mr. Garfield "then commented that he could not understand that given it is needed for managing our business," and he "then took a piece of paper out of [his] pocket and wrote a note."  (Id.).

The April 18 meeting continued, and a presenter indicated that two reports were run on different days and one element of data had to be calculated manually.  At that point, Mr. Garfield "exploded" at Ms. Gilbert that she had not disclosed this fact in a presentation she had given a few weeks earlier, and he asked her why she would let others "waste their time trying to determine the difference."  (Id. at 3-4).  Ms. Gilbert answered that she thought she had disclosed it, and Mr. Garfield asked if anyone else remembered Ms. Gilbert mentioning it; no one responded.  (Id. at 4).  Ms. Gilbert then stated that she had a copy of the presentation, and Mr. Garfield walked over and "grabbed a copy."  (Id.).

In a written complaint dated April 21, 2002[3] – three days after the April 18 meeting–

---

[3]The date on this document is April 21, 2001, but the year is apparently incorrect.  It refers to events occurring in 2002.  (Ex. 2 to Susan Moore Aff., Def.'s Ex. 10).

Ms. Gilbert complained to Jerry Montgomery, the Vice President of Human Relations, that Mr. Garfield was treating her in a discriminatory fashion because of her gender. (Ex. 2 to Susan Moore Aff., Def.'s Ex. 10). Ms. Gilbert requested an investigation of Mr. Garfield's treatment of her. (Id.). Ms. Gilbert met with Mr. Montgomery on April 23, and on April 24th she provided a written statement entitled "WDW Discrimination Complaint" (Ex. 30 to Gilbert Dep.). In her written complaint, Ms. Gilbert stated: "I began to be treated differently than my male peers in public settings by my leader, Randy Garfield[,] when a series of operational challenges in my department occurred in February 2002." (Id. at 1). Ms. Gilbert then recounted the meetings in February, March, and April in which Mr. Garfield treated her disrespectfully.

Ms. Gilbert identified several people to be interviewed in the investigation of her complaint. Although Ms. Gilbert initially had asked that Mr. Montgomery conduct the investigation, shortly thereafter she told him that she was uncomfortable with him conducting the investigation because she felt he had informed Mr. Garfield of her complaint. (Doc. 34 at 9 ¶ 24; Doc. 41 at 13 ¶ 24). Because of Ms. Gilbert's concerns, Mr. Montgomery asked Sue Moore of HR Compliance to conduct the investigation in his stead. (Doc. 34 at 9 ¶ 24; Doc. 41 at 13 ¶ 24). Moore interviewed, and took statements from, all of the people that Ms. Gilbert requested be interviewed, as well as several others. (Moore Aff. at 3-4; Exs. 3-19 to Moore Aff.). At the conclusion of her investigation, Ms. Moore determined that there was no evidence to support Ms. Gilbert's discrimination claim. (Doc. 34 at 10 ¶ 29; Doc. 41 at 13 ¶ 29). In an affidavit, Ms. Moore explains: "My investigation revealed that no evidence supported Gilbert's claim that she had been treated differently than her male peers. To the

contrary, a number of people, both male and female, had voluntarily raised the problems they were having with Gilbert's leadership.  Additionally, a number of people commented on the fact that Garfield had a very direct style and would raise questions of both male and female employees in a group setting when he felt further information or clarification was needed." (Moore Aff. at 5 ¶ 12).

On May 16, 2002, Ms. Moore and Mr. Montgomery met with Ms. Gilbert.  Ms. Moore informed Ms. Gilbert the result of the investigation, and Mr. Montgomery informed Ms. Gilbert that she was being terminated due to problems with her leadership.  (Doc. 34 at 10-11 ¶ 30; Doc. 41 at 13 ¶ 30).  As explained by Mr. Garfield, the termination decision could not be implemented until after the investigation of Ms. Gilbert's discrimination complaint had been completed.  (Garfield Aff. at 17 ¶ 44).

Ms. Gilbert filed a charge of discrimination with the EEOC in September 2002.  (Pl.'s Ex. 6).  The EEOC issued its Dismissal and Notice of Suit Rights in May 2003.  (Pl.'s Ex. 6).  Ms. Gilbert filed suit in this Court on August 20, 2003.  (Doc. 1).

## II.  Legal Discussion

### A.  Summary Judgment Standards

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of establishing that no genuine issues of material fact remain. Celotex Corp. v. Catrett, 477

U.S. 317 (1986).

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997). "The evidence presented cannot consist of conclusory allegations or legal conclusions." Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991); see also Fed. R. Civ. P. 56(e) (providing that nonmovant's response "must set forth specific facts showing that there is a genuine issue for trial").

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). However, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Moreover, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

"Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing Anderson, 477 U.S. at 250-51). "'In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.' Essentially, the inquiry is 'whether the evidence presents a sufficient

disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" Id. (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988) and Anderson, 477 U.S. at 251-52); see also LaRoche v. Denny's, Inc., 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment."). "[T]he summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." Chapman v. AI Transp., 229 F.3d 1012, 1026 (11th Cir. 2000).[4]

## B.  The Merits of WDPR's Motion

Ms. Gilbert contends that she was terminated based on her gender and in retaliation for complaining about gender discrimination. These claims[5] will be discussed in turn, after the issue of a potential hostile work environment claim is briefly addressed.

---

[4]In her opposition memorandum, Ms. Gilbert cites Duncan v. Delta Consolidated Industries, Inc., 371 F.3d 1020, 1024 (8th Cir. 2004), for the proposition that "[s]ummary judgment is seldom granted in discrimination cases due to intensive state of mind questions." (Doc. 41 at 17).  While this may be a correct statement of law in the Eighth Circuit, this court is within the Eleventh Circuit, and the Chapman case cited in the text is controlling. Moreover, even the Eighth Circuit approves the grant of summary judgment in the discrimination context in an appropriate case.  See, e.g., Pope v. ESA Servs., Inc., 406 F.3d 1001, 1006 (8th Cir. 2005) ("We have noted that summary judgment 'should seldom be utilized' in employment discrimination cases.  However, this Court also has noted that 'there is no "discrimination case exception" to the application of Fed. R. Civ. P. 56, and it remains a useful pretrial tool to determine whether or not any case, including one alleging discrimination, merits a trial.'") (citations omitted).

[5]Ms. Gilbert brings claims under both Title VII and the FCRA.  Courts consistently apply the case law interpreting Title VII to claims under the FCRA as well because the FCRA is patterned on Title VII.  See, e.g., Wilbur v. Corr. Servs. Corp., 393 F.3d 1192, 1195 n.1 (11th Cir. 2004).  Hence, the discussion of the Title VII claims in this Order applies equally to the FCRA claims, and the FCRA claims will not be addressed separately.

1.  Hostile Work Environment

There is some disagreement between the parties as to whether Ms. Gilbert has brought a hostile work environment claim in addition to her claims based on disparate treatment and retaliation.  In a footnote in its summary judgment motion, WDPR states, "It does not appear that Gilbert has brought a hostile work environment claim.  The events she alleges are not sufficiently severe or pervasive to create a hostile work environment, nor has she any evidence the events were because of sex."  (Def.'s Mot. for Summ. J., Doc. 34 at 14 n.6).  In her opposition memorandum (Doc. 41), Ms. Gilbert does not make any argument regarding, or even mention, a hostile environment claim.

However, in the Joint Pretrial Statement (Doc. 49), a dispute regarding the pendency of a hostile environment claim emerges.  The "Concise Statement of Nature of Action" section of the Pretrial Statement provides:  "Gilbert claims that Defendant engaged in illegal sex discrimination in the form of disparate treatment, a hostile work environment, and retaliation during her employment and subsequent termination from Defendant.  Defendant denies Gilbert's allegations regarding her treatment and states that her employment was terminated for legitimate business reasons."  (Doc. 49 at 1-2) (footnote omitted).  The footnote to this statement reads:

> Defendant contends that Gilbert has waived her hostile environment claims because she did not oppose the Defendant's Motion for Summary Final Judgment as to that claim.  Plaintiff contends she did not waive her hostile environment claim inasmuch as Defendant wrote one footnote comprising "briefing" on this matter.  Further, Gilbert specifically attacked defendant's investigation of her internal complaint within her opposition papers at Fact ¶ 21.  Gilbert contends Defendant did not argue

these issues before this Court; and to the extent "briefed" the issue, failed in its proof.  Finally, it is Gilbert's contention that the facts proffered by Gilbert substantiate Garfield's treatment of Gilbert altered her terms, privileges and conditions of employment.

(Doc. 49 at 2 n.1).

The Court agrees with WDPR that Ms. Gilbert waived any potential hostile environment claim by not addressing it in her opposition memorandum.  WDPR's doubt as to whether Ms. Gilbert was pursuing such a claim is understandable, as the Court does not read the Amended Complaint (Doc. 8) as stating a hostile environment claim.  Thus, WDPR's treatment of such a claim in a footnote in its summary judgment motion is not surprising, and if Ms. Gilbert wished to contest the assertion in that footnote that she did not appear to be bringing a hostile work environment claim, the time to do so was in her opposition memorandum, not in the Joint Pretrial Statement.  Ms. Gilbert did not mention the claim in her opposition memorandum, and she thereby waived any such claim and cannot revive it by mentioning it in the Joint Pretrial Statement – a document which is designed to assist the Court in preparing for trial, not in ruling on a summary judgment motion.[6]  Although Local Rule 3.06(e) provides that "[a]ll pleadings filed by any party prior to filing of the pretrial statement shall be deemed merged therein," it does not provide that waived claims can be revived by mention in the pretrial statement, nor is there any other basis for so concluding.

Moreover, even if Ms. Gilbert had not waived her hostile environment claim by not

_____

[6]Indeed, the summary judgment motion could have been disposed of even before the Joint Pretrial Statement was filed or without the Court having reviewed the Joint Pretrial Statement.

addressing it in her summary judgment response,  there is no basis in the Amended

Complaint or the record for such a claim in any event.  First, as noted above, the Court does

not read the Amended Complaint as asserting a hostile work environment claim but only

disparate treatment and retaliation.

Additionally, the evidence in this case falls far short of that necessary to establish a

gender-based hostile work environment.  The Eleventh Circuit has explained:

> [T]o establish a claim of hostile-environment based on
> harassment by a supervisor, an employee must show:  (1) that
> he or she belongs to a protected group; (2) that the employee
> has been subject to unwelcome sexual harassment, such as
> sexual advances, requests for sexual favors, and other conduct
> of a sexual nature; (3) that the harassment must have been
> based on the sex of the employee; (4) that the harassment was
> sufficiently severe or pervasive to alter the terms and conditions
> of employment and create a discriminatorily abusive working
> environment; and (5) a basis for holding the employer liable.

Williams v. Motorola, Inc., 303 F.3d 1284, 1292-93 (11th Cir. 2002) (citing Mendoza v.

Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999)).  In this case, although Ms. Gilbert is a

member of a protected group, there is no evidence of the second, third, or fourth elements.[7]

First, the conduct of which Ms. Gilbert complains is not gender-related but instead

consists of neutral comments and criticisms made by Mr. Gilbert in the course of conducting

business.  Second, there is no basis for concluding that the "harsh" treatment of Ms. Gilbert

by Mr. Garfield was based on her gender.  Finally, the evidence in this case falls far short

of satisfying the fourth element of a hostile work environment claim; even if the conduct on

---

[7]The Court need not address the fifth element – a basis for holding the employer liable.

which Ms. Gilbert bases her allegations were even remotely gender-related, the conduct was not "sufficiently severe or pervasive to alter the terms and conditions of employment." Williams, 303 F.3d at 1293.

"If the complained of statements and conduct are of a gender-related or sexual nature, there are four factors that [are considered] in determining whether they are sufficiently severe and pervasive from an objective standpoint to alter an employee's terms or conditions of employment: '(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.'" Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 584 (11th Cir. 2000). Here, the alleged incidents were infrequent; Ms. Gilbert relies on only a few events that occurred at a handful of meetings over a three-month period. Additionally, the conduct was not severe, but consisted only of sex- and gender-neutral verbal rebukes during business meetings. The conduct was not physically threatening but consisted merely of utterances; the most "threatening" conduct that Ms. Gilbert has complained about was one incident where Mr. Garfield grabbed papers out of her hand during a meeting.

Finally, although there is evidence that Ms. Gilbert suffered distress at work and her job performance suffered, it is far from clear that her problems were due to Garfield's conduct rather than her own concerns about her department and her own performance, nor is her attribution of her distress to gender discrimination an objectively reasonable reaction to Mr. Garfield's conduct. Cf. Gupta, 212 F.3d at 586 ("[A] plaintiff's subjective feelings and personal reactions are not the complete measure of whether conduct is of a nature that it

interferes with job performance.  If it were, the most unreasonably hypersensitive employee would be entitled to more protection than a reasonable employee, and the standard would not have an objective component."); Trujillo v. Univ. of Colo. Health Scis. Ctr., 157 F.3d 1211, 1214 (7th Cir. 1998) ("The hostile work environment that Plaintiff portrays is simply a work environment that exhibits the monitoring and job stress typical of life in the real world. Normal job stress does not constitute a hostile or abusive work environment."); Burton v. Batista, 339 F. Supp. 2d 97, 111 (D.D.C. 2004) ("The discrimination laws do not guarantee employees a stress-free work environment.").  Even much more troubling conduct has been found insufficient to amount to an actionable hostile work environment claim in this circuit. See, e.g., Gupta; see also Williams, 303 F.3d at 1293 (finding no basis for hostile environment claim where most of the alleged incidents were not related to the plaintiff's sex, and "[t]he conduct alleged by [the plaintiff] [fell] well short of the level of either severe or pervasive conduct sufficient to alter [the plaintiff's] terms or conditions of employment so as to sustain her claims").  Thus, even if a hostile environment claim could fairly be read into the Amended Complaint and had not been waived, the evidence does not support such a claim.

### 2.  Ms. Gilbert's Disparate Treatment Claim

Ms. Gilbert claims that she was terminated based on her gender.  Because Ms. Gilbert has not presented any direct evidence of discrimination, she must rely on the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny in order to attempt to establish her disparate treatment claim by circumstantial

evidence. <u>See, e.g.</u>, <u>EEOC v. Joe's Stone Crab, Inc.</u>, 220 F.3d 1263, 1286 (11th Cir. 2000) ("Disparate treatment claims require proof of discriminatory intent either through direct or circumstantial evidence. . . . Absent direct evidence, a plaintiff may prove intentional discrimination through the familiar <u>McDonnell Douglas</u> paradigm for circumstantial evidence claims.") (citations omitted); <u>accord</u> <u>Harris v. Sec'y of the Army</u>, 119 F.3d 1313, 1320 (8th Cir. 1997) ("Because she has no direct evidence of discrimination, Harris' sex discrimination claim is governed by the burden shifting analysis first articulated in <u>McDonnell Douglas v. Green</u>."). Under this framework, the plaintiff in a disparate treatment case has the initial burden to establish a prima facie case of discrimination by a preponderance of the evidence. <u>McDonnell Douglas</u>. As the Eleventh Circuit has noted, "[d]emonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997). If the plaintiff establishes a prima facie case, a presumption of discrimination arises. <u>See, e.g.</u>, <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248 (1981).

Once the plaintiff has presented a prima facie case and its attendant presumption, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for its actions. <u>McDonnell Douglas</u>, 411 U.S. at 802. The employer's "burden is one of production, not persuasion; it 'can involve no credibility assessment.'" <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142 (2000) (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 509 (1993)). "If the employer satisfies its burden by articulating one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for

illegal discrimination." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004).

For the purposes of its summary judgment motion, WDPR does not challenge Ms. Gilbert's satisfaction of a prima facie case[8] of discriminatory termination, conceding that (1) Ms. Gilbert is a member of a protected class; (2) she suffered an adverse employment action (termination); (3) she was qualified to do the job; and (4) she was replaced by someone outside of her protected class.[9] In response to Ms. Gilbert's prima facie case, WDPR has met its burden of articulating a legitimate, nondiscriminatory reason for its termination of Ms. Gilbert – performance deficiencies, including lack of effective leadership of DRC. Thus, WDPR is entitled to summary judgment on the discriminatory termination claims unless Ms. Gilbert presents evidence creating a genuine issue of material fact regarding whether this reason is a mere pretext for discrimination. See, e.g., Chapman v. AI Transp., 229 F.3d

---

[8]Although counsel for Ms. Gilbert notes the correct elements of a discrimination case in the opposition memorandum, she states that satisfaction of those elements entitles her "[t]o prevail on [her] claim." (Doc. 41 at 8). However, satisfaction of the prima facie case is not synonymous with prevailing on the claim, but instead is merely the first step; as set forth in the text, once a plaintiff makes a prima facie case, the defendant has an opportunity to respond to that case by explaining its actions. Although Ms. Gilbert's counsel appears to understand this distinction – as evidenced by some further argument in the memorandum beyond the prima facie elements – the Court cautions counsel to be careful in the phrasing of her arguments so as to not to confuse these different concepts.

[9]As noted by WDPR in its motion (Doc. 34 at 15 & n.9), there is an alternative formulation of the fourth prima facie element – that similarly situated employees outside the protected class were treated more favorably. See, e.g., Holifield v. Reno, 115 F.3d 1555 (11th Cir. 1997). WDPR does not concede that this element has been met, and in her opposition memorandum Ms. Gilbert maintains her position that she was treated less favorably than a similarly-situated male. (See Doc. 41 at 18). However, in light of WDPR's acknowledgment of the satisfaction of the prima facie case as noted in the text, the Court need not address the "similarly situated" issue in its discussion of whether Ms. Gilbert has satisfied her prima facie case.

1012, 1024-25 (11th Cir. 2000) ("If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim."); accord Evans v. McClain of Ga., Inc., 131 F.3d 957, 964-65 (11th Cir. 1997) ("Under the established rule of law in this Circuit, a plaintiff can survive a motion for summary judgment or for judgment as a matter of law by presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons.").

Ms. Gilbert's entire argument in her opposition memorandum regarding pretext reads as follows:

> [A] close review of Defendant's proffered reasons for its termination of Gilbert reveals the company has been inconsistent in its reasons. A factfinder may reject some of the defendant's proffered reasons thus impeding the employer's credibility seriously enough that it may also disbelieve the remaining proffered reasons even if no evidence undermining those remaining rationales in particular is available. Therefore, a reasonable factfinder in reviewing the circumstances of this case may determine that Defendant had impermissible animus in its decisions failing to retain Gilbert or to offer her a transfer, demotion, or performance improvement plan.

(Doc. 41 at 18-19) (citation omitted). Although these generalities do little to assist the Court in discerning Ms. Gilbert's theory as to pretext, Ms. Gilbert seems to assert that male executives were demoted, transferred, or placed on a formal performance improvement plan and that because she was not, WDPR's explanation is not worthy of credence.[10]  However,

---

[10]The parties argue in their papers about who made the decision to terminate Ms. Gilbert; WDPR maintains that it was Mr. Garfield and that the fact that he both hired her and

-21-

Ms. Gilbert is incorrect.

"To show that the employer's reasons were pretextual, the plaintiff must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.'" Cooper v. S. Co., 390 F.3d 695, 725 (11th Cir. 2004) (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir.1997)).  Ms. Gilbert has not done so.  Cf. Tidwell v. Carter Prods., 135 F.3d 1422, 1427 (11th Cir. 1998) (finding no issue raised as to pretext where the plaintiff did "not provide the needed 'more than a scintilla of evidence' to survive a motion for judgment as a matter of law" and did "not present a substantial conflict in evidence as to [the employer's] purported reason for terminating Tidwell . . . as to support a jury question").

As the Eleventh Circuit has explained, "[t]he inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of [her] performance." Holifield,

---

fired her rebuts any notion of discriminatory animus, citing Labady v. Gemini Air Cargo, Inc., 350 F. Supp. 2d 1002, 1014 (S.D. Fla. 2004), in which the district court granted summary judgment for the employer based in part on the fact that the same person both hired and fired the plaintiff. However, in Williams v. Vitro Services Corp., 144 F.3d 1438, 1443, 1446 (11th Cir. 1998), the Eleventh Circuit held that this fact may be considered by jury in determining the pretext issue but is not a basis for the grant of summary judgment by the Court. The Labady court cited Williams as well as cases from other circuits, but it appears to have erroneously relied on Williams to the extent it read Williams as authorizing summary judgment based on such evidence.  Thus, it would not be appropriate for this Court to grant summary judgment on the basis that the hirer and firer are the same actor, and it does not do so.

Moreover, Ms. Gilbert does not make any argument in her memorandum regarding failure to receive severance pay.  Even if she had, WDPR has presented its severance pay policy, which clearly provides that severance pay is not available to employees who are terminated for unsatisfactory performance.  (Disney Severance Pay Plan, Ex. 2 to Frank Aff.).

115 F.3d at 1565; accord Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1332-33 (11th Cir. 1998).  Although Ms. Gilbert contends that her performance was not poor or that she at least should have been counseled or demoted instead of terminated, her assertions and perceptions do not cast sufficient doubt on WDPR's explanations to survive summary judgment.

Ms. Gilbert's reliance on her favorable performance reviews through fiscal 2001 is misplaced.  The record reflects that although Ms. Gilbert had excellent "people skills" and was successful at part of her job, when her department was faced with the changes and challenges brought on by CRM and Destination Disney, she faltered, or at least, her superiors had a good-faith belief that she faltered.  See Cuddeback v. Fla. Bd. of Educ., 381 F.3d 1230, 1236 (11th Cir. 2004) (affirming grant of summary judgment for employer where employee had received highest possible rating in October 1999 and was terminated in May 2000; rejecting employee's pretext argument that was based on, inter alia, alleged "abrupt change in [supervisor's] opinion of her performance, the lack of any convincing explanation for the sudden negative view of her performance, [and] the lack of any meaningful opportunity for her to improve any perceived deficiencies in her performance").  Again, the issue is not Ms. Gilbert's performance, but WDPR's perceptions of her performance.  Cf. Jones v. Winn-Dixie Stores, Inc., 75 F. Supp. 2d 1357, 1366 (S.D. Fla. 1999) ("Whether or not the employer turns out to be right about the employee's conduct is not relevant, as long as the discipline was not based on discriminatory animus.").

Ms. Gilbert simply has not cast doubt on WDPR's good-faith belief that Ms. Gilbert was ineffective in leading DRC in 2002.  Although Ms. Gilbert may feel that she was unfairly

blamed for DRC's problems, WDPR is entitled to hold her responsible for those problems. See, e.g., Michaelson v. Waitt Broad., Inc., 187 F. Supp. 2d 1059, 1072 (N.D. Iowa 2002) (noting that plaintiff, the general sales manager for a television station, "was in charge of the entire sales force" and "was the person responsible for developing and implementing viable sales strategies as well as hiring and training a sales staff," and thus "[t]he downturn in advertising sales . . . could reasonably be attributed to some failing on his part"). Moreover, even if Ms. Gilbert was unfairly blamed, unfairness is not the same as unlawful discrimination; so long as WDPR did not fire her based on her gender (or other legally prohibited reason), it could fire her for any reason it chose. See, e.g., Pollocks v. Sunland Training Ctr., 85 F. Supp. 2d 1236, 1245 (N.D. Fla. 2000) ("So long as the articulated reason is not based on race or other prohibited characteristics, it need not be a reason that seems wise or logical; under Title VII, an employer lawfully may take action for any non-discriminatory reason, good or bad, fair or unfair, or for no reason at all.").

    As to Ms. Gilbert's argument that she should have been demoted or transferred instead of terminated, WDPR has explained that executives were sometimes counseled – as, clearly, Ms. Gilbert was – but were not often placed on performance improvement plans. Kelly Frank, a Vice President in Human Resources, explains in her affidavit that although formal performance development was used for employees through the manager level, "it was not [the company's practice] to follow that procedure for executives." (Frank Aff. at 3 ¶ 7). Attached to Ms. Frank's affidavit is an excerpt from a training class which states in part, "in situations involving executives or other cast members with important responsibilities in the Company, a pattern of unacceptable behavior may result in termination without utilization of

other performance management tools in order to avoid significant disruption to the critical functions of our business." (Ex. 1 to Frank Aff.). Moreover, the evidence reflects that Mr. Garfield noted in his meetings with Mr. Weiss that options including a performance plan and a "role swap" were considered for Ms. Gilbert but were ultimately rejected (Exs. 10 & 12 to Garfield Aff.); these options were deemed to be unfeasible because Ms. Gilbert's performance did not improve with the feedback she was given and no substitute role in the company was found for her. Ms. Gilbert's performance deficiencies were determined to be unremediable – this is not to say that Ms. Gilbert was not a competent executive, just that she did not have the appropriate skill set for the challenges that DRC faced in 2002. Indeed, Ms. Gilbert capably led DRC for more than three years. In her internal complaint even Ms. Gilbert notes that Mr. Garfield's treatment of her became, in her view, disrespectful "when a series of operational challenges in [her] department occurred in February 2002." (Ex. 30 to Gilbert Dep. at 1). The fact that Mr. Garfield became more stern in meetings around the time that DRC was facing problems is entirely consistent with WDPR's articulated reasons and inconsistent with the conclusion that all of a sudden Mr. Garfield became hostile toward Ms. Gilbert because of her gender.

Ms. Gilbert claims that Bob Gall, whose role she assumed and who then reported to her when she was hired at WDPR, was on a performance improvement plan when she was hired and that she in fact helped him with that plan. Mr. Gall states in an affidavit that he did recall Ms. Gilbert coaching him and outlining expectations for him in a memorandum, but it was not "pursuant to the formal performance management process." (Aff. of Robert Gall, Def.'s Ex. 8). However, the fact that Mr. Gall may have received more formal coaching than

did Ms. Gilbert does not create an issue as to pretext here.

In essence, Ms. Gilbert seeks to have this Court step in and second-guess WDPR's business decisions.  This the Court will not do.  Cf. Davis v. Town of Lake Park, 245 F.3d 1232, 1244 (11th Cir. 2001) ("A contrary view would potentially open the door to a wide variety of unfair work assignment claims that should not be litigated in the federal courts. Title VII is not designed to make federal courts '"sit as a super-personnel department that reexamines an entity's business decisions."'") (quoting Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)); Tidwell, 135 F.3d at 1427 ("'[A] plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer.'") (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997)) (alteration in original); Smith v. Ala. Dep't of Pub. Safety, 64 F. Supp. 2d 1215, 1228 (M.D. Ala. 1999) ("[T]he court's responsibility [is] not to second guess the wisdom of [Defendant's] reasoning, but to determine if the reasons given were merely a cover for discriminatory intent.'") (quoting Brown v. Am. Honda Motor Co., 939 F.2d 946, 951 (11th Cir. 1991)) (all but first alteration in original).  Second-guessing of an employer's decisions is especially inappropriate when the employee is an executive at a high level in the company as was Ms. Gilbert; an employer is entitled to require more from a management-level employee and to determine for itself whether any performance deficiencies are remediable. Cf. Michaelson v. Waitt Broad., Inc., 187 F. Supp. 2d 1059, 1072 (N.D. Iowa 2002) (noting that "[c]ourts have held that an employer is justified in holding management to a higher standard of performance"); accord Gaston v. Home Depot USA, Inc., 129 F. Supp. 2d 1355,

1371 (S. D. Fla. 2001).  Ms. Gilbert has failed to present the required "more than a scintilla of evidence" necessary to survive summary judgment, and WDPR prevails on her disparate treatment claim.

### 3.  Ms. Gilbert's Retaliation Claim

Ms. Gilbert also claims that she was terminated in retaliation for filing a discrimination complaint with the Human Relations Department.   The burden-shifting framework of McDonnell Douglas and its progeny discussed above in connection with the disparate treatment claim applies to the retaliation claim as well.  To make a prima facie showing of retaliation,[11] a plaintiff must establish:  (1) that she engaged in activity protected by Title VII; (2) that the employer was aware of such activity; (3) that the employee suffered an adverse employment action;  and (4) a causal link between the activity and the adverse action. Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999).  In its summary judgment motion, WDPR challenges the fourth, "causal link" element of Ms. Gilbert's prima facie case.

WDPR argues that Ms. Gilbert cannot show a "causal link" between her complaint and her termination because the evidence shows that the decision to terminate her was made

---

[11]The anti-retaliation provision of Title VII provides in part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

before she made her complaint.   This argument, however, seems more appropriately addressed at the pretext stage than in evaluating the prima facie case;[12] "[f]or purposes of a prima facie case, 'close temporal proximity' may be sufficient to show that the protected activity and the adverse action were not 'wholly unrelated.'"  Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 590 (11th Cir. 2000) (quoting Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999)).   Ms. Gilbert filed her internal complaint on April 22 and was terminated on May 16 – less than a month later.   Under prevailing case law, this is a short enough time span to satisfy the "causal link" element,[13] and the Court will give Ms. Gilbert the benefit of a prima facie case.

In response to this prima facie case, of course, WDPR articulates its reason for terminating Ms. Gilbert not as retaliation but as performance deficiencies, as discussed earlier in connection with the disparate treatment claim.   Additionally, to overcome the adverse inference that might be drawn from the timing of the termination, WDPR asserts, and has presented abundant evidence, that the decision to terminate Ms. Gilbert based on her performance problems was made in early April – before Ms. Gilbert filed her complaint with the Human Relations Department.   Indeed, Ms. Gilbert concedes that Ms. Frank and Mr. Garfield had discussed terminating her in April.   (See Doc. 41 at 10 ¶ 18).

───────────────────

[12]In any event, the result here is the same whether Ms. Gilbert's retaliation claim fails at the prima facie stage or the pretext stage.

[13]See, e.g., Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004) ("We have held that a period as much as one month between the protected expression and the adverse action is not too protracted." (citing Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1457 (11th Cir. 1998)).

In response to these explanations, Ms. Gilbert states:  "Defendant wrote in its EEOC response that based upon information gained from the internal investigation, Gilbert was terminated.  Further, as stated above, it [is] absolutely astonishing how many individuals wrote scathing reports of Gilbert's performance during the 'investigation' of discrimination. A reasonable jury drawing all inferences in Gilbert's favor could determine that Gilbert's termination was motivated by impermissible animus based upon her complaints of discrimination."  (Doc. 41 at 19) (internal record citation omitted).

Ms. Gilbert's arguments do not impeach WDPR's explanation for its actions and the timing of Ms. Gilbert's termination.  A fair reading of the "based upon information gained from the internal investigation" statement of WDPR is that once it investigated and determined there was no merit to Ms. Gilbert's discrimination complaint, the prior decision to terminate her could be effectuated.  The fact that the investigation turned up unfavorable comments about Ms. Gilbert's performance – including comments by people whom Ms. Gilbert instructed the Human Relations Department to interview – does not undermine the well-documented explanation that the decision had been made before Ms. Gilbert filed her internal complaint.  No genuine issue of fact as to pretext has been raised, and thus WDPR is entitled to summary judgment on Ms. Gilbert's retaliation claim.

III.  Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1.  Defendant Walt Disney Parks and Resorts, LLC's Motion for Summary Final Judgment (Doc. 34) is **GRANTED** as to all of Plaintiff's claims.

2.  All other pending motions are **DENIED as moot**.

3.  The Clerk is directed to enter judgment in favor of Defendant Walt Disney Parks and Resorts, LLC in accordance with this Order.  Thereafter, the Clerk shall close this file.

**DONE** and **ORDERED** in Orlando, Florida this 3rd day of August, 2005.

_____

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party

-30-